[Civ. No. 1077. Third Appellate District.—January 31, 1913.]

## ZULEIKA J. BALDWIN, Appellant, v. HENRIETTE B. TRAHERN, Respondent.

DEED BY HUSBAND OF ALL PROPERTY TO WIFE—ACTION TO SET ASIDE— UNDUE INFLUENCE—MENTAL INCOMPETENCY—EVIDENCE—SUPPORT OF FINDINGS.—In an action to set aside a deed made by a husband of all his property to his wife, on the alleged grounds of undue influence and mental incompetency, the evidence is held. to show no undue influence, but showed, without conflict, that the husband was entirely competent to transact business, and understood thoroughly the nature and contents of the deed, the execution of which to his wife was urged by himself, and entirely sufficient to sustain the court's findings as to the mental competency of the grantor, and that it was his express purpose by the executed, acknowledged, and delivered deed, to vest all of his property in his wife.

APPEAL from an order of the Superior Court of San Joaquin County denying a new trial. Frank H. Smith, Judge.

The facts are stated in the opinion of the court.

Albert Jacoby, and Louis Ferrari, for Appellant.

'A'. H. Ashley, for Respondent.

BURNETT, J.—This is an action brought to set aside a deed on the ground of undue influence and the incompetency of the grantor. The deed was made by George W. Trahern to his wife, Henriette B. Trahern, on August 17, 1909, twenty-eight days before the death of the grantor, on September 14, 1909. The deed recites a consideration of love and affection and was duly acknowledged, delivered, and recorded on the day of its execution. Plaintiff claimed to be the daughter of

the grantor and, in her alleged capacity as heir, brought the action to set aside said deed. The answer denied that appellant was his daughter and also denied his unsoundness of mind and the exercise of any undue influence.

The court found that plaintiff was the illegitimate daughter of the grantor but that she was never legitimatized by any act or acknowledgment of said grantor. The court also found that no undue influence was exercised on the said grantor by any person and that, "on the 15th day of August, 1909, and up to the time of his death, said George W. Trahern was continuously of sound mind and during all of said time was mentally able to, and did, understand, realize and comprehend the nature, result and effect of his act or acts in the signing and affixing his signature to, and acknowledging and delivering a document, bill of sale or other instrument, and to, and did understand and realize and comprehend the nature, result and effect of his act or acts in making and entering into a contract."

No evidence whatever was offered by plaintiff to sustain the allegation of undue influence, and since it is entirely clear from the record that the finding of the court in reference to the mental condition of said grantor and his execution and delivery of said deed is abundantly supported by the evidence, it is perfectly clear that the other finding, that plaintiff was never recognized by said grantor as his daughter, need not be considered, as it is not necessary to support the judgment.

In reference to the mental condition of said grantor at the time of the execution of said deed, it may be said that there is really no conflict in the evidence, as the testimony of all the witnesses upon that point substantially agrees that he was entirely competent to transact business, understood thoroughly the nature of the transaction and that it was his purpose and desire to vest the title of said property entirely in his said wife, the grantee, and that the deed was properly signed, acknowledged, and delivered by him to said grantee at the time alleged. To show how fully the finding of the court is supported, it will be necessary to quote only from the testimony of two witnesses.

George F. McNoble, who prepared the deed and who took the acknowledgment of the grantor, testified, among other

things: "I was an intimate acquaintance, confidential friend and legal advisor of Mr. Trahern. In the summer of 1909 I spent my vacation near Lake Tahoe; I got home on August 14th, Saturday morning, at half past nine, and called at the Trahern house that evening, between half past seven and nine o'clock. I then saw Mr. Trahern up stairs, sitting on a settee. I had conversation with him. There were three or four persons present, Mrs. Trahern, Rachael, Dr. Hammond, the son's daughter, and possibly Mrs. Williams. Mr. Trahern called me by name and said he had been anxious for me to come home, that he wanted to fix up those papers. He had previously spoken to me about expenses about probating, making deeds, etc., in June or May, some time earlier. I asked him what disposition he wanted to make of his property and he said he wanted to deed all of his property to his wife, Ret, he called her. He asked me if I could draw up the papers and I told him I could. He asked when, and I said, 'Your place is one of those old Mexican grants, I suppose; I will have to go to Wilhoit for a description before I can make a conveyance.' Mr. Trahern said he would like to have the matter fixed up and consulted me about his bank book and account, personal property, live stock, and all that. I assured him that I could make a present conveyance of all of his property by combined deed and bill of sale in the one deed. He asked me if it would be good; I told him it would. I explained to him that there must be a present delivery and so that he could exercise no control; that if there was a present delivery to the grantee, title must then pass and the grantee have absolute control. I went over the matter very carefully with him, explaining to him that if he should recover from his illness, and go on the ranch again, that he would not have control of his property. I asked him if he desired to deliver the deed in escrow accompanied by a memorandum showing irrevocable delivery. He said he had delayed the transfer of his property to his wife somewhat longer than what he really should have done and that he wanted the deed executed and delivered to his wife at once and recorded at once." The witness, after stating that no one else participated in the conversation, declared that after the deed was written he went out with it by appointment, on August 17th, between twelve and one o'clock, and continuing: "Mrs. Tra-

hern, their son and their two daughters and I think the grand-daughter were there. I told Mr. Trahern I brought the papers out and that they were now ready for his execution. I said to him that the first thing I would like to have him do was to read the instrument over and see if he was satisfied with its contents. He took the instrument and read it over and read about the personal property. He said, 'This includes the bank account, does it?' I said, 'Yes, it includes your bank account, any paper, everything you have got in the way of personal property.' He said, 'Very well.' I then read the deed aloud, including all the land description, and then asked him if it represented his intention. He said it did. A table and writing materials were brought in. The table was not well adjusted and he wrote his name as it is signed to the deed. I then asked him if it was his act and deed and he said it was. I asked him if he acknowledged the execution of the deed as his act and deed and he said he did. I said to his son, 'Now you and I will sign our names to this instrument as witnesses and to this act of your father,' and we did so. I then handed him back the deed, which was yet unfolded. He took it up in his hands, one of which from an old injury was not flexible and folded the instrument rather clumsily and loosely and handed it to his wife, saying, 'Here, Ret, this is for you.' His wife was pretty much nonplussed and confused and she said, 'What shall I do with it?'' He said, 'You take it and have it recorded.' '' The witness afterward stated: ''I know the man was of sound mind,'' and, furthermore: ''I never urged Mr. Trahern to do anything about his property. I had no interest in it in any way. I did not do anything in the way of corruptly or at all controlling or intending to influence him or to prevail upon him or persuade him or importune him or overpower him in the execution of this deed, and I never heard his son or his wife, Henriette B. Trahern, say anything at all of that nature.''

David D. Trahern, the son of the grantor, 37 years of age, detailed also the transaction and, among other things, testified: ''He was of as sound a mind as any man that I ever knew in my life, up to the time the deed was executed and after. This was so up to the morning of the day he died. Based upon my intimate acquaintance, my father was just as sound when the deed was signed, acknowledged and delivered

by him as he ever was in his life, as sound as any of us in the courtroom to day; he was never incompetent at any time in his life. My reasons are that he was able to carry on and did carry on his business. Nothing was done or said by me to him at the time of the execution of this deed, or prior thereto, with reference to obtaining the execution of such deed, nor was anything done or said in that regard by either my mother or Mr. McNoble. My father was not mentally feeble on August 17, 1909; his mind was perfectly normal, always has been.''

There is other evidence to the same effect but it seems unnecessary to call particular attention to it. In fact, the reading of the transcript creates the impression that, as stated by the trial judge, ''the preponderance in favor of the defendant is so overwhelming as to practically preclude all doubt in the matter.''

There seems absolutely no merit in the appeal and the order denying the motion for a new trial is affirmed.

Chipman, P. J., and Hart, J., concurred.